UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NATIONAL EXCHANGE BANK AND TRUST,

    Plaintiff,

    v.    Case No. 11-CV-134

PETRO-CHEMICAL SYSTEMS, INC., et al.,

    Defendants.

# DECISION AND ORDER DENYING THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

## I. FACTS AND PROCEDURAL HISTORY

National Exchange Bank and Trust ("NEBAT") is the trustee for the Fife Family Trust A, which owns a residence in Fond du Lac, Wisconsin. (Docket No. 67, ¶¶9-10.) In preparation to sell the property, NEBAT hired Petro-Chemical Systems, Inc. ("Petro-Chemical") to test the tightness of an underground fuel oil storage tank on the property. (Docket No. 67, ¶15.) Petro-Chemical subcontracted this job to Tanknology, Inc. (Docket No. 67, ¶16.) On April 2, 2010, Tanknology's technician performed the test, which included disconnecting pipes attached to the furnace and then reconnecting those pipes. (Docket No. 67, ¶21.) The tank failed the test and therefore on April 8, 2010, Ron Engel ("Engel"), a tank remover/cleaner and site assessor hired by NEBAT, went to the property to assess the costs of removing the tank. (Docket No. 67, ¶¶19, 24-26.) He measured the fuel in the tank and did not detect anything unusual. (Docket No. 67, ¶26.) Five days later, Engel returned to the property and found a significant fuel oil spill in the basement. The fuel oil was flowing out from the bottom of the furnace and eventually made its way through a hole in the

basement floor. (Docket No. 67, ¶13.) Investigation revealed that a small fire had burned inside one of the home's two furnaces, (Docket No. 67, ¶¶36-37), that seals on both oil pumps had failed, (Docket No. 67, ¶¶64-66), and the piping from the tank to the furnace was connected backwards, (Docket No. 67, ¶40). The parties appear to agree that this reversed piping led to buildup of pressure that caused the seals on the pumps to fail. (Docket No. 67, ¶¶66-69.) Approximately 550 gallons of fuel oil spilled from the failed seals and into the basement, some of which is believed to have seeped into the soil below the basement. (Docket No. 67, ¶103.)

On February 3, 2011, NEBAT filed the present action against Petro-Chemical, Tanknology, and their respective insurers, (Mid-Continent Casualty for Petro-Chemical and Steadfast Insurance Company and Zurich American Insurance Company for Tanknology), (Docket Nos. 1, 8), alleging claims under state common law for breach of contract, negligence, and nuisance, and under the Resource Conservation and Recovery Act ("RCRA"), (Docket No. 8). On October 1, 2012, NEBAT filed a motion seeking summary judgment with respect to its claim that Petro-Chemical and Tanknology created an imminent and substantial danger under the RCRA. (Docket No. 46.) Petro-Chemical, (Docket No. 59), and Tanknology, (Docket No. 66), responded, and NEBAT replied, (Docket No. 71). Tanknology also filed its own motion for partial summary judgment regarding the question of whether trustee fees and maintenance costs are recoverable under the RCRA and negligence or nuisance theories under Wisconsin common law, (Docket No. 56), to which NEBAT has responded, (Docket No. 62), and Tanknology has replied, (Docket No. 75). The pleadings on these motions are closed and the matters are ready for resolution. All parties have consented to the full jurisdiction of a magistrate judge. (Docket Nos. 3, 16, 22.)

**II. SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). A material fact is one that might affect the outcome of the case, and a nonmoving party's dispute is "genuine" only if a reasonable finder of fact could find in the nonmoving party's favor at trial. Anderson, 477 U.S. at 248-49. The court views the facts in the light most favorable to the non-moving party, and likewise it draws all inferences in the non-movant's favor. Ault v. Speicher, 634 F.3d 942, 945 (7th Cir. 2011). The court may not weigh the evidence or make credibility determinations. Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003). Thus, the nonmoving party will defeat a motion for summary judgment if it is able to produce admissible evidence that, when viewed in the most favorable light, would be sufficient to enable the finder of fact to return a verdict in its favor. Fleishman v. Cont'l Cas. Co., 698 F.3d 598, ___ (7th Cir. 2012).

### III. NEBAT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

NEBAT contends that when Tanknology's technician reconnected the pipes to the furnace, he did so backwards, thus leading to a buildup of pressure, the eventual failure of the seals in the pumps, and finally the fuel leak. It contends that this spill may present an imminent and substantial endangerment to health or the environment under 42 U.S.C. § 6972(a)(1)(B), and therefore Tanknology is responsible under the RCRA. It contends that Petro-Chemical is also responsible under the RCRA because it contributed to the spill by subcontracting to Tanknology and not properly supervising its work.

In response, Tanknology's foremost argument is that there exists a factual dispute as to whether its technician switched the piping. It also contends that by simply testing the tank, its actions were insufficient to come within the scope of the RCRA. Petro-Chemical likewise argues that merely subcontracting the work to Tanknology was insufficient to bring its actions within the scope of the RCRA. Finally, Petro-Chemical argues that the RCRA is inapplicable because the spill

3

does not constitute an imminent and substantial endangerment to human health and the environment.

> Under the RCRA
>
> any person may commence a civil action on his own behalf…against any person,… including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).

The court begins with NEBAT's contention that Petro-Chemical "contributed" to the disposal of the fuel oil because it subcontracted the tank test to Tanknology and then allegedly failed to inspect Tanknology's work. In support of its theory that an entity may be responsible for the work of a subcontractor, NEBAT points to Cox v. City of Dallas, Tex., 256 F.3d 281 (5th Cir. 2001), where the court held that a city contributed to the relevant waste disposal by failing to properly supervise its contractors. Id. at 297-98. However, Cox is readily distinguishable because in that case the city generated the waste and knew that its demolition and waste disposal contractor engaged in illegal dumping. Id. at 297. Petro-Chemical did not generate the waste, nor is there any evidence that Tanknology had a record of unlawful actions, much less that Petro-Chemical knew this. Here, Petro-Chemical simply hired Tanknology as a subcontractor. In NEBAT's view, this was sufficient because "but for Petro-Chemical, Tanknology would not have performed work at the Fife Property and count not have caused the spill." (Docket No. 71 at 3.)

Although courts have concluded that Congress intended "contributed" to be interpreted liberally, Aurora Nat. Bank v. Tri Star Mktg., Inc., 990 F. Supp. 1020, 1028 (N.D. Ill. 1998) (citing United States v. Price, 523 F.Supp. 1055, 1073 (D.N.J. 1981), the court finds no reason to conclude that Congress intended the term "contributed" to be an invitation to string together an expansive causal chain of tangential defendants. The Court of Appeals for the Ninth Circuit, relying in part

4

upon the Seventh Circuit's decision in Sycamore Indus. Park Assocs. V. Ericsson, Inc., 546 F.3d 847, 854 (7th Cir. 2008), rejected this sort of expansive interpretation of "contributed" when it denied a property owner's claim against the manufacturers of dry cleaning equipment. Hinds Investments, L.P. v. Angioli, 654 F.3d 846, 851-52 (9th Cir. 2011). Although the pollution on the property owner's land arguably would not have occurred but for the manufacturers' failures to incorporate pollution control technology into their products and publication of manuals instructing users to dispose of waste into drains or open sewers, the court found these actions to be outside the scope of the RCRA. Id. at 852. Thus, the court concludes that absent some additional facts, such as those alleged in Cox, a contractor like Petro-Chemical is not liable under the RCRA simply because it hired an allegedly malfeasant subcontractor. Accordingly, NEBAT's motion for summary judgment with respect to its RCRA claim against Petro-Chemical shall be denied.

Turning now to NEBAT's motion for summary judgment with respect to its claims against Tanknology, the court begins with Tanknology's contention that its actions are outside the scope of the RCRA because it did not contribute to the handling, storage, treatment, transportation, or disposal of any waste. (Docket No. 66 at 10-12.) Tanknology argues that it never had any interaction with the fuel oil; it merely inspected the system. And in any event, when Tanknology was on the premises, the fuel oil was contained in the tank and thus not waste. Tanknology notes that courts have held that "a plaintiff must allege that the defendant had a measure of control over the waste at the time of its disposal or was otherwise actively involved in the waste disposal process." Hinds Investments, L.P. v. Angioli, 654 F.3d 846, 852 (9th Cir. 2011); see also Sycamore, 546 F.3d at 854 ("A plain reading of the 'has contributed or is contributing' language of § 6972(a)(1)(B) compels us to find that RCRA requires active involvement in handling or storing of materials for liability."); ABB Indus. Sys. V. Prime Tech., 120 F.3d 351 (2d Cir. 1997); Interfaith

Cmty. Org. v. Honeywell Int'l, Inc., 263 F. Supp. 2d 796, 831 (D.N.J. 2003) ("only active human involvement with the waste is subject to liability under [the RCRA]").

While the isolated statements cited by Tanknology, each addressing an inapposite factual situation, might tend to support Tanknology's view of the law, the plain text of the statute does not. An entity is liable under the RCRA if it "contributed" to the disposal of hazardous or solid waste. By definition, this requires some form of affirmative action. Sycamore, 546 F.3d at 854. The affirmative action that allegedly occurred here was Tanknology switching the piping connected to the furnace. This switch allegedly led directly to the spill and in the court's view is plainly sufficient to support a conclusion that Tanknology contributed to the spill. Congress certainly did not intend to allow a polluter to avoid liability through, for example, a creative use of timed release valves and ensuring to be a good distance away when the hazardous waste is dumped. Tankolgy's alleged actions led directly to the spill and in the court's view this is quite obviously within the scope of the statute.

The court likewise finds little merit in Tanknology's contention that it is not liable because when it was at the property, the fuel oil was not a hazardous waste. (Docket No. 66 at 13.) Again, the statute requires only that Tanknology contributed to the disposal of the hazardous waste. Tanknology rightly concedes that the fuel oil was a hazardous waste after it had spilled. (Docket No. 66 at 13.) And as set forth above, the plaintiff adequately alleges that Tanknology contributed to the disposal of that hazardous waste by taking actions that directly led to a massive spill in the basement of the residence.

However, there is a dispute of material fact with respect to the factual crux of this case—whether Tanknology switched the lines. The fact that Tanknology disconnected and reconnected the piping 11 days before the fuel spill was discovered and there is no evidence of anyone else working on those lines during that time period certainly creates a strong suggestion that Tanknology was the

6

one to switch those lines. But summary judgment would be appropriate only if this was the only reasonable conclusion. The unoccupied house was left unsecure during the relevant period and thus there certainly was the opportunity for someone else to switch those lines. But most importantly, even NEBAT's own expert agrees that the pumps' seals would fail soon after the furnace began to run with the connections reversed. (Docket No. 53-1 at 3.) Tanknology's expert evaluated weather conditions and other factors and concluded that the furnaces likely would have run between the time Tanknology completed its test on April 2, 2010 and Engel's first visit to the home on April 8, 2010 when he found no problems. (Docket No. 69-2 at 10.) Thus, if the finder of fact accepted the testimony of Tanknology's expert and concludes that the furnace had run between April 2, 2010 and April 8, 2010, it would seem to preclude a finding that Tanknology had switched the lines. At this point, drawing all inferences in favor of the non-moving party, it appears that a reasonable finder of fact could conclude that the furnaces ran between April 2, 2010 and April 8, 2010. This factual dispute concerning the switching of the lines will have to be resolved at trial. Therefore, NEBAT's motion for summary judgment with respect to its RCRA claims against Tanknology must be denied.

## IV. TANKNOLOGY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Tanknology contends that NEBAT's trustee fees and maintenance costs incurred since the spill and continuing to accrue, currently totaling over $88,000.00, are not recoverable in an action under the RCRA or a common law negligence or nuisance action. (Docket No. 58.) NEBAT responds that it is not seeking any trustee fees or maintenance costs under the RCRA. (Docket Nos. 62 at 8; 64 ¶18.) Instead, it is seeking certain costs it expended investigating the spill, which it characterizes as compensable litigation expenses. (Docket Nos. 62 at 8; 64 ¶18.) Since Tanknology is challenging the recovery of trustee fees or maintenance costs as damages under the RCRA, the court regards NEBAT's response indicating that it is not seeking these expenses as damages under the RCRA, as having mooted this aspect of Tanknology's motion.

The court now turns to the issue of whether NEBAT may recover trustee fees or maintenance costs as part of its common law nuisance and negligence actions. (Docket Nos. 62 at 10; 64 ¶19.) On a motion for summary judgment, the court is presented with the question of only whether, as a matter of law, trustee fees and maintenance costs are not compensable damages under a negligence or nuisance action such as this.

Tanknology contends that under Wisconsin law, with respect to a claim for negligence or nuisance, a plaintiff may recover damages for only (1) property repair costs; (2) property restoration costs; (3) the diminished value of the property; (4) loss of use; and (5) annoyance and discomfort. (Docket No. 58 at 12-13.) NEBAT responds that trust fees and maintenance costs are compensable because they were incurred allegedly as a result of Tanknology's actions. Had the spill not occurred, the property would have been sold and it would not have incurred ongoing trust fees and maintenance costs.

"[T]he general rule in Wisconsin is that a property owner's damages are the lesser of the cost of repair or the property's diminished value." Nischke v. Farmers & Merchants Bank & Trust, 187 Wis. 2d 96, 118, 522 N.W.2d 542, 551 (Ct. App. 1994). In explaining this general rule, the court of appeals subsequently noted:

> There are multiple ways to calculate damages in a lawsuit over injury to property. One is the cost to repair the property (i.e., replace the bricks). A second is the cost to restore the property (i.e., re-stain the bricks). A third way to measure damages is the diminished value calculation—"the difference between the value the building would have had if properly constructed and the value that the building does have as constructed." W. G. Slugg Seed & Fertilizer, Inc. v. Paulsen Lumber, Inc., 62 Wis. 2d 220, 226, 214 N.W.2d 413 (1974). Any party may submit estimates of the cost of repair/restoration or diminished property value. Laska [v. Steinpreis], 69 Wis. 2d [307,] 314[, 231 N.W.2d 196, 200 (1975)]. The plaintiff is entitled to the smaller amount. Id.

Champion Cos. of Wis., Inc. v. Stafford Dev., LLC, 2011 WI App 8, ¶12, 331 Wis. 2d 208, 794 N.W.2d 916. Tanknology contends that this articulation of three ways of calculating damages, along with damages for loss of use, (see Docket No. 58 at 10 (citing Schwalbach v. Antigo Elec. & Gas,

8
Case 2:11-cv-00134-AEG   Filed 12/03/12   Page 8 of 11   Document 77

Inc., 135 N.W.2d 263, 269, 135 N.W.2d 263, 269 (1965))), represent an exclusive list of damages that are compensable in a case alleging negligent damage to property. Finally, Tanknology notes that damages for annoyance, discomfort, and inconvenience may be available in a nuisance action. (Docket No. 58 at 10 (citing Krueger v. Mitchell, 112 Wis. 2d 88, 106, 332 N.W.2d 733, 742 (1983)).) With respect to these latter two categories of damages, Tanknology contends that these sorts of damages are inapplicable because the property was unoccupied throughout the relevant period. Thus, the court shall limit its discussion to the three ways to measure damages, as set forth in Champion.

Tanknology comments that NEBAT has failed to cite any case where a court has held that trustee fees and maintenance costs or analogous expenses were compensable in an action such as this. (Docket No. 75 at 6.) But by the same token, neither has Tanknology cited any case where a court has rejected the claim NEBAT makes here.

The court is not persuaded that in articulating the *ways* in which damages may be calculated, Wisconsin courts sought to limit the *sorts* of damages a plaintiff may recover in a tort involving real property. From a review of the relevant case law, it seems clear that the courts presented the three different methods for calculating damages as part of a general policy seeking to avoid an unjust windfall for a prevailing plaintiff. The courts were discussing the "economic waste rule," Champion, 2011 WI App 8, ¶13, 331 Wis. 2d 208, 794 N.W.2d 916, which many will recognize as applying when an automobile is "totaled." Just as it would be illogical and inequitable to have a tortfeasor pay $10,000 to repair a car that was worth only $5,000 before an accident, an owner suffering damage to real property may recover, at most, compensation for the decrease in the value of the property. So if real property was worth $150,000 before the defendant's actions and $25,000 after, but it would cost $200,000 to fix whatever damage caused by the defendant, the plaintiff could usually recover, at most, $125,000, which represents the diminished value of the property. Cf.

9

Champion, 2011 WI App 8, ¶1, 331 Wis. 2d 208, 794 N.W.2d 916 (holding trial court properly awarded $11,000 to remedy an appearance defect in bricks of a home through re-staining rather than $344,000 to remove and replace bricks).

However, the Wisconsin Court of Appeals recognized an exception to this general rule in cases where repair is required by law, such as in cases of environmental cleanup. Nischke, 187 Wis. 2d at 118, 522 N.W.2d at 551. This is because when it comes to polluted land, a landowner may be required to clean up contamination on the property, even if those cleanup costs exceed the value of the property. Thus, an owner of a contaminated property might not be able to sell the property at a greatly reduced price or even give the property away. In such cases, the property might be seen as effectively having a negative value and thus full and fair compensation for tortious contamination would require compensation in excess of the diminished value. The plaintiff would not enjoy a windfall.

In much the same manner, there is no indication that permitting NEBAT to recover the trustee fees or maintenance costs would do anything other than fairly compensate the plaintiff for its loss. NEBAT's unnecessary holding costs might be seen as analogous to depreciation; the end result is that by losing out on the sale and subsequently being unable to sell the property for a period of time, the net proceeds the trust shall realize from the sale of the property likely have been diminished. If the plaintiff can persuade the finder of fact that but for the spill, the sale of the house would have gone through, and thus NEBAT would have avoided all the trustee fees and maintenance costs it subsequently incurred, the court finds no reason why NEBAT should not be able to recover these damages. The plaintiff would not obtain an unjust windfall but rather would merely be made whole. Accordingly, Tanknology's motion for partial summary judgment shall be denied.

V.  **CONCLUSION**

An entity is liable under the RCRA if it contributed to the disposal of waste. However, absent additional facts, a contractor does not contribute to disposal merely because it hired the subcontractor that allegedly engaged in unlawful actions. Thus, NEBAT's motion for partial summary judgment with respect to its RCRA claim against Petro-Chemical shall be denied. So too will the court deny NEBAT's motion for partial summary judgment as to its RCRA claim against Tanknology. While Tanknology's actions may have contributed to the disposal of waste, there is a dispute of material fact as to whether Tanknology switched the lines and caused the spill. Finally, the court shall deny Tanknology's motion for partial summary judgment with respect to the question of whether NEBAT may recover trustee fees and maintenance costs as part of its common law negligence and nuisance claims. If proven, the recovery of such damages would appear necessary to fully compensate the plaintiff for its injury.

**IT IS THEREFORE ORDERED** that National Exchange Bank and Trust's motion for partial summary judgment, (Docket No. 46), is **denied**.

**IT IS FURTHER ORDERED** that Steadfast Insurance Company, Tanknology Inc, and Zurich American Insurance Company's motion for partial summary judgment, (Docket No. 56), is **denied**.

Dated at Milwaukee, Wisconsin this 3rd day of December, 2012.

AARON E. GOODSTEIN
U.S. Magistrate Judge